# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**UNITED STATES OF AMERICA,**    :

**v.**                    : **CRIMINAL CASE NUMBER:**

**OLAYINKA OLANIYI**          : **1:15-cr-00457-2-SCJ-JSA**

## REPORT AND RECOMMENDATION

Defendant, a Nigerian national residing in Kuala Lumpur, Malaysia, was arrested on November 4, 2015 by the Royal Malaysian Police ("RMP"). The arrest was initiated by request from the U.S. Department of Justice's Office of International Affairs. Specifically, the U.S. Government had procured a provisional arrest warrant in Malaysia on the basis of Defendant's suspected involvement in a 2014 illegal computer intrusion into the electronic systems of the Georgia Institute of Technology ("Georgia Tech"), and a related fraud scheme. Defendant has since been extradited on the basis of an indictment charging him with these violations in this District.

The matter is now before the Court on Defendant's Motion to Suppress [48]. Among other things, Defendant alleges that he was beaten by members of the RMP, and that his subsequent statements to the FBI as well as other evidence seized during his arrest should be suppressed as a result. For the reasons explained below, the undersigned **RECOMMENDS** that the Motion to Suppress [48] be

**DENIED**.

## I.    FACTUAL BACKGROUND

The Court held an evidentiary hearing on Defendant's motion, on September 29, 2017 and October 16, 2017 [83][87].  A transcript of the hearing was prepared [86][90].  The transcript of the portion of the hearing convened on September 29, 2017 is found on the docket as entry 86, and includes pages 1-63.  The transcript of the portion of the hearing convened on October 16, 2017 is found on the docket as entry 90, and includes pages 64-93.  The Court will refer to this transcript as a single continuous document, e.g, "Tr. at __."

Special Agent Tyson Fowler, a member of the Cybercrime Squad of the Federal Bureau of Investigation's Atlanta Field Office, testified at the September 29th hearing.  Tr. at 4.  S/A Fowler explained that this case began with a victim complaint from Georgia Tech, which had suffered a substantial computer intrusion affecting payroll systems that involved employee payroll funds fraudulently transferred to unknown depository accounts.  *Id.* at 4-5.  The investigation led the agents to identify the Defendant and a Co-Defendant, who were living in Malaysia, as the perpetrators of this scheme.  *Id*.  Thus, "through the proper legal channels and through the diplomatic process, we established a relationship with law enforcement officials in Malaysia and coordinated a time for us to fly to Malaysia and coordinated a time for us to fly to Malaysia to try to further the case and to

obtain the Defendants for which we had a provisional arrest warrant at that time." *Id.* at 5.

On November 4, 2015, the Defendant was arrested at his residence in Kuala Lumpur by members of the RMP. *Id.* at 5-6. S/A Fowler and his colleague, FBI S/A Chad Hunt, were present in Kuala Lumpur and coordinated with the RMP, although the American agents did not participate in the arrest or any search of Defendant's residence. *Id.* at 6-7. Prior to the arrest, the American agents met with and briefed the RMP officers as to the facts obtained in their investigation and the contents of the provisional arrest warrant. *Id.* The RMP executed that warrant, although they informed S/A Fowler that they also independently arrested Defendant for unrelated Malaysian immigration law violations that they discovered in connection with preparing to execute the U.S. warrant. *Id.* Specifically, "they noticed that Mr. Olaniyi and his Co-Defendant had overstayed their visa, and so they were able to issue a warrant for an overstay of his visa and arrest on those charges locally." *Id.* at 7.

S/A Fowler explained that the RMP obtained various items of electronic evidence from the residence during the arrest, including computers, a cell phone, and storage media. *Id.* S/A Fowler's understanding is that these items were seized pursuant to Malaysian law. *Id.* at 13-14. The RMP allowed the FBI access to the equipment. *Id.* The FBI agents "obtained computer forensic images which is just a

bit-for-bit copy of the hard drives of the different electronic devices." *Id.* at 13-14. The FBI brought the forensic images back to the U.S. for purposes of this prosecution but left the originals in the custody of the RMP. *Id.* at 14. While the FBI made the forensic copy in Malaysia, it did not conduct any actual searches of the electronic information until applying for and receiving a search warrant in this District. The warrant was introduced as Gov't Ex. 2.

S/A Fowler is unaware whether the RMP questioned the Defendant during the arrest. *Id.* at 7. The FBI agents conducted their own interview of the Defendant after the arrest. *Id.* at 7-8. A digital recording of that interview, which S/A Fowler testified was accurate and complete, *id.* at 9-10, was admitted as Gov't Ex. 1, and a transcript was admitted at Gov't Ex. 3.

When the agents arrived at the interview room at the RMP's offices, the Defendant was already present, handcuffed behind the back. *Id.* at 10. The agents released his handcuffs shortly after arriving, before the substantive interview questions. Gov't Ex. 3 at 19-20. The room resembled a typical police department interview room, "like I've been in a hundred times in the States." Tr. at 9. The Defendant confirmed his "very good" understanding of English. Gov't Ex. 3 at 2-3; Tr. at 10-11. During the course of the interview, S/A Fowler perceived that the Defendant understood the conversation. *Id.* at 10-11. Before proceeding into questions about the offenses, the agents advised the Defendant of his *Miranda*

rights, and the Defendants acknowledged that he understood those rights and nevertheless agreed to answer questions.  Tr. at 10; Gov't Ex. at 16-19.

S/A Fowler testified that neither he nor anyone else, to his knowledge, made Defendant any promises or threatened him in anyway before or after the interview, which lasted just under two hours.  Tr. at 11.  The agents spoke in calm tones and offered the Defendant water.  *Id.* at 12.

The agents specifically informed the Defendant that they were American law enforcement officers from the FBI.  Gov't Ex. 3 at 6-7.  The Defendant obviously understood that he was being questioned by American law enforcement officers, and believed that he was speaking to them outside the presence of the RMP.  The Defendant specifically stated that "I like to be in custody of you guys because I'm not safe here."  Gov't Ex. 3 at 5.  The Defendant emphasized that "I know my rights," but that he was concerned that "I don't have a right [here] because I've been in some problems in Malaysia."  *Id.*  By contrast with Defendant's expression of concern about whether he would be safe in Malaysian custody, he specifically acknowledged to S/As Fowler and Hunt that "I know you guys are not going to hurt me."  *Id.* at 13.

Defendant explained, "I'm scared because I know when you guys leave here, it's another thing."  Gov't Ex. 3 at 15.  In response, S/A Fowler explained, prior to any interrogation or rendering of *Miranda* warnings, that "when we leave, you'll –

you're gonna be held at our request so then you are under our protection in some ways and I'll explain that." *Id.* Defendant does not allege or suggest that the agents conditioned any such protection on Defendant's agreement to waive his *Miranda* rights and answer questions. Also, although Defendant had expressed concern about not being safe in Malaysia, and clearly understood that he was safe with the American agents, he did not complain of any pain or mistreatment or exhibit any other signs of trauma, injury or having been beaten or otherwise mistreated by Malaysian authorities. Tr. at 12. S/A Fowler specifically noted that Defendant did not complain or otherwise show signs of any pain or injury while standing, bringing his handcuffs over his head in front of him, and holding his wrists out so that they agents could release the cuffs. *Id.* The agents proceeded to interview Defendant in what appeared to be a cooperative tone for just under two hours. *Id.* at 11.

The Defendant then testified at the suppression hearing. *See* Tr. at 32. The Defendant explained that on the day of his arrest, he arrived at his residence to find four "men in plainclothes" who apparently turned out to be RMP officers. *Id.* at 33-34. According to the Defendant, these men made him kneel down, handcuffed him, and proceeded to beat him for 20-25 minutes. *Id.* at 33-34. The Defendant stated that the officers punched and kicked him, and called him names, during this time. *Id.* According to the Defendant, the beating was intermingled with

interrogation: "they ask a question.  When I don't tell them, when I don't tell them what they want, they beat me."  *Id.* at 34.  The officers allegedly stated, "America wants you," "you were a terrorist," and "you're going to Guantanamo."  *Id.*  The Defendant did not explain the subject matter of this interrogation and, specifically, whether it related to the suspected violations of Malaysian law or the U.S. computer intrusion investigation, or both.  In total, Defendant was held at the residence for approximately two hours, and was brought to the RMP police station after that.  Tr. at 42.

The Defendant claimed that the RMP officers demanded his passwords for "either your phone or your computer," and in response to leading questions from his attorney agreed that he only gave them the passwords because he was being beaten.  *Id*. at 37. S/A Fowler testified, however, that the FBI did not have or need any passwords in order to make the forensic images of the computers.  *Id.* at 13 ("We were able to image them, to image the computers on scene without a password needed.")  S/A Fowler also stated that Defendant himself unlocked his own phone, at one point during the FBI's interrogation, because he wanted to make a phone call, and needed to get into his contact list to get a particular phone number.  *Id.*  As S/A Fowler stated, "other than that, we did not need a password."  *Id*.

The Defendant explained that he was interviewed alone by FBI agents, and

that he told them about not being safe in Malaysia and about having been

previously beaten in Malaysia. *Id.* at 38. Nevertheless, the Defendant did not tell

the agents about having been beaten earlier that day, because he was concerned

that this information would get back to the Malaysian authorities. *Id.*

After his FBI interview, Defendant went back into Malaysian custody. *Id.* at

38-39. According to Defendant, Malaysian officers immediately demanded his

ATM bank password. *Id.* at 38-39. Defendant was beaten for approximately 10

more minutes at this point, with "slaps" to his "legs and my knees and my hips."

Tr. at 39.

At one point, the Defendant came into contact with his Co-Defendant, who

was also in Malaysian custody. The Defendant told the Co-Defendant that he (the

Defendant) had been beaten, and the Co-Defendant allegedly told Defendant that

the RMP also beat him (the Co-Defendant). Tr. at 46, 49. Further, the Co-

Defendant also told Defendant that the officers "made him wear woman's clothes

and put a wig on his head, and they were snapping pictures of him like it looks like

a woman." Tr. at 46. The RMP at some point, after the FBI interview, took the

two Defendants to a place "where there was no CC TV," and instructed them to

start slapping each other on the face, which they did. Tr. at 46-47.

Subsequently, the Government called the Co-Defendant, who has entered a

guilty plea and agreed to cooperate with the Government in this case. Tr. at 69.

The Co-Defendant, who shared an apartment in Kuala Lumpur with the Defendant, explained that he (the Co-Defendant) was kicked in the head at the beginning of the search one time, after having initially physically resisted the search: "When they came in, I tried to guard the door with them when they try to come in.  So there's so many of them, they push me in, and I fell on the floor.  Then one of them kick me in the head, and that's it, and they handcuffed me."  *Id.* at 70.  He otherwise described no beatings during the search or arrest, and stated that he was not threatened in any way prior to his interview with the FBI.  *Id.* at 70-72.  The Co-Defendant denied that the Defendant ever complained about being beaten by the RMP during any of their time together after the arrest (which included sleeping in the same cell), and stated that the Defendant did not appear injured in any way when they encountered each other in the police station.  *Id.* at 72, 75-76.  The Co-Defendant, however, did corroborate the Defendant's testimony in one respect:  the Co-Defendant also testified to the odd incident in which some jail guards directed the two arrestees to slap each other.  *Id.* at 75.  The Co-Defendant explained that they slapped each other, at the guards' direction, six or seven times, although this did not result in any injuries other than some "redness."  *Id.* at 74.  As the Defendant had also explained, this incident occurred after the FBI interviews.  *Id.* 73-74.

## II.     DISCUSSION

### A.     *The Seizure And Search Of Defendant's Computer Equipment*

Defendant seeks to suppress all physical evidence seized from his residence in Kuala Lumpur during his arrest, which seizure Defendant argues "was without probable cause and proper warrant, and in violation of his rights under the Fourth and Fifth Amendments of the Constitution." [48] at 6-7.  This argument appears to apply to the various items of computer equipment, including a cell phone, obtained from the residence and/or Defendant's person during the arrest.

This argument is meritless because "[e]vidence obtained by foreign police officers from searches carried out in their own countries is generally admissible in American courts regardless of whether the search complied with the Fourth Amendment."  *United States v. Rosenthal*, 793 F.2d 1214, 1230-1231 (11th Cir. 1986).  Among other reasons for this principle, there is obviously a "doubtful deterrent effect on foreign police practices that will follow from a punitive exclusion of the evidence in question by an American court."  *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir. 1976).[1]

There are two exceptions by which American courts can apply the Fourth Amendment exclusionary rule to foreign searches: "(1) if the foreign officers'

---

[1] Decisions of the Fifth Circuit prior to October 1, 1981 are considered binding precedent in the Eleventh Circuit.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

conduct 'shocks the conscience of the American courts' and (2) if 'American officials participated in the foreign .... interrogation, or if the foreign authorities were acting as agents for their American counterparts,' also known as the joint venture doctrine." *United States v. Frank*, 599 F.2d 1221, 1228-1229 (11th Cir. 1980) (internal citations omitted). "The first exception is based on a federal court's inherent 'supervisory powers over the administration of federal justice.'" *United States v. Emmanuel*, 565 F.3d 1324, 1330 (11th Cir. 2009) (internal citations omitted). The second exception "is based on a defendant's Fourth Amendment rights." *Id.*

Here, it is undisputed that the second exception–the so-called "joint venture doctrine"–does not apply, because the Defendant cannot show that he is entitled to the protections of the Fourth Amendment at all. "[T]he Fourth Amendment does not apply to the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country." *Id.* at 1331 (*citing United States v. Verdugo–Urquidez*, 494 U.S. 259, 271 (1990)). While aliens enjoy some constitutional rights, they are not protected by the Fourth Amendment vis-a-vis foreign searches if they have "no previous significant voluntary connection with the United States . . . ." *Verdugo–Urquidez*, 494 U.S. at 271. Here, the Defendant was a citizen of Nigeria residing in Malaysia, who allegedly chose to commit his crimes against United States victims while located in

Malaysia.  He concedes, therefore, that he lacks any Fourth Amendment rights to assert in this case.  *See* Def. Br. [98] at 4.

The "shocks the conscience" exception also does not bar the computer equipment that the Government seeks to use in this case.  The Court will discuss Defendant's allegations of having been beaten by the RMP in more detail below, in connection with his Fifth Amendment argument to suppress his statements.  But the facts do not suggest that any physical evidence was seized as a specific result of this alleged beating.  Rather, the Defendant's account of the seizure of his equipment resembled little more than an ordinary search incident-to-arrest in the United States:

> Q.    Did they seize any property from you?
>
> A.    Yeah.
>
> Q.    What did they take from you?
>
> A.    They took my phone and a laptop bag that was with me with my wallet and everything on me.
>
> Q.    Was there a laptop in the laptop bag or just a bag?
>
> A.    There was a laptop in the laptop bag.
>
> Q.    And they took both your phone and your laptop from you?
>
> A.    Yes, sir.

Tr. at 36.

Nothing about the fact that the RMP officers seized Defendant's computer equipment and other property during his arrest "shocks the conscience."  While the officers may have lacked a warrant specifically authorizing a search for and seizure of these materials, the RMP advised the FBI that it did not need such a warrant under Malaysian law.  Defendant provides no argument otherwise, that is, that the seizure of these electronic materials was illegal under Malaysian law.  In any event, the courts have held "conduct does not shock the judicial conscience when it is 'simply illegal'; rather, it must be 'egregious.'" *United States v. Getto*, 729 F.3d 221, 228 (2d Cir. 2013) (internal citations omitted).  The mere seizure of electronic evidence in the possession or in the residence of an arrestee suspected of computer crimes is not, in itself, "egregious."

While U.S. Fourth Amendment law did not apply to this search, it is hardly clear that the RMP's search for and seizure of Defendant's electronic equipment would have violated the Fourth Amendment, either.  Under U.S. law, items in the possession of an arrestee may be seized and searched in many circumstances as incident-to-arrest, and obviously incriminating material may be seized if seen in plain view while authorizing a valid arrest warrant.  While the Supreme Court in recent years has clarified that the internal contents of smart phones and computer storage media may not be automatically searched incident-to-arrest, *see Riley v. California*, 573 U.S. __, 134 S.Ct. 2473 (2014), there is no indication that the RMP

or the FBI did that here.  Rather, the FBI simply obtained a forensic copy of the electronic media while in Malaysia, and refrained from actually searching the electronic memory of that media until it obtained a proper search warrant from a judicial officer in this district.

While the RMP's alleged beating of Defendant obviously would have violated U.S. law, the Court finds it unnecessary to consider whether this conduct was so "egregious" as to "shock the conscious" for purposes of considering whether to suppress the physical evidence.  Plaintiff makes no showing that this conduct related specifically to or resulted in the seizure of the electronic evidence in Defendant's possession.  Rather, the evidence suggests simply that this material was seized as being in Defendant's possession and/or his apartment when he was arrested, as it very well might have been had the arrest occurred in the U.S.  The record suggests that any beating was immaterial to the RMP's mere seizure of this electronic evidence, or at least Plaintiff makes no showing otherwise.[2]

---

[2] As noted above, in response to leading questions from his lawyer at the hearing, the Defendant testified that he divulged his cellphone and other electronic passwords to the RMP officers only because he was being beaten.  While this conduct would not be countenanced in U.S. courts, it is also immaterial to the question here.  S/A Fowler testified that the FBI did not obtain any passwords from the RMP, did not need any such passwords to access and make a copy of the computers obtained from the RMP, and that the Defendant himself voluntarily unlocked his own phone during the FBI interview for purposes of retrieving a phone number.  Tr. at 13.  More broadly, S/A Fowler was unaware of any statements that the Defendant made to the RMP, *id.* at 23, and the Government concedes that it would not use any such statements even if they had been made.

**B.** *Defendant's Statements To The FBI*

As noted above, the Government concedes that it will not use, and in fact is entirely unaware of, any statements the Defendant may have made to the RMP. The issue raised by Defendant's motion, therefore, is whether his statements *to the FBI* should be suppressed on the basis of the alleged misconduct perpetrated by the RMP.  The Court finds that suppression is not warranted.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . without due process of law." U.S. Const. Amend. V.  Accordingly, a criminal defendant cannot be compelled, forced, tortured, threatened or coerced by law enforcement into giving a confession; in order for the confession to be admissible at trial against the defendant, it must have been given freely and voluntarily.  Thus, if a Defendant moves to suppress her incriminating statements to law enforcement, the Government bears the burden to show that the Defendant's statements were made voluntarily.  *See Jackson v. Denno*, 378 U.S. 368 (1964).  Determining whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994); *see Arizona v.*

---

Thus, any illegal Malaysian interrogation on the specific subject of passwords does not taint the Government's use of the seized evidence itself, which did not require or use any such information.

*Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

In determining whether a defendant's confession was free and voluntary, the Court must assess "the totality of all the surrounding circumstances"--both the characteristics of the accused and the details of the interrogation. *Miller v. Fenton*, 474 U.S. 104, 111 (1985); *see also United States v. Roark*, 753 F.2d 991, 993 (11th Cir. 1985) ("In analyzing the voluntariness of a confession, the totality of the circumstances surrounding the confession must be examined.") (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

"[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citation omitted)). Factors which should be considered by courts in assessing voluntariness include the length of the interrogation, the age of the accused, and whether law enforcement used physical punishment such as the deprivation of food or sleep. *Schneckloth*, 412 U.S. at 226; *United States v. Jones*, 32 F.3d 1512, 1516-17 (11th

Cir. 1994); *see also United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362

(11th Cir. 1984) (the voluntariness of a confession must be evaluated on a

case-by-case basis).  The most crucial factor is whether the police engaged in

coercion or overreaching because, "[a]bsent police conduct causally related to the

confession, there is simply no basis for concluding that any state actor has deprived

a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157,

164 (1986).

Relatedly, in  *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court

held that a suspect who is in custody must be advised of his right to remain silent

and of his right to the assistance of counsel prior to any interrogation by law

enforcement.  The Supreme Court also made clear that the Government has the

burden to show the knowing and intelligent nature of a waiver. *See Miranda*, 384

U.S. at 475. Indeed, the Supreme Court made clear that "[i]f the interrogation

continues without the presence of an attorney and a statement is taken, a heavy

burden rests upon the government to demonstrate that the  defendant knowingly

and intelligently waived  his privilege against self-incrimination and  his right to

retained or appointed counsel."  *Id.*

The Supreme Court instructs us to look for two things in assessing this

question:

First, the relinquishment of the right must have been voluntary in the

sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation omitted).

While the Fourth Amendment does not apply extraterritorially to nonresident aliens, *Verdugo–Urquidez*, 494 U.S. at 271, the Government does not make the same argument with respect to Defendant's right against involuntary self-incrimination pursuant to the Fifth Amendment, or to Defendant's rights under *Miranda*.  Therefore, the Court looks to whether the Government has met its burden to prove that the FBI agents complied with *Miranda* during their interrogation in Kuala Lumpur, and whether the Defendant waived his rights and made incriminating statements voluntarily and knowingly.  Moreover, courts have suggested that the due process "shocks the conscience" standard can apply to exclude coerced confessions, even when obtained by agents of a foreign country. *United States v. Maturo*, 982 F.2d 57, 60–61 (2d Cir. 1992).

The Court finds in the Government's favor, however, on all of these issues. Defendant does not dispute, and the record clearly shows, that S/A Fowler properly read Defendant his *Miranda* rights before any interrogation, Defendant

acknowledged and appeared to understand those rights, and then nevertheless agreed to answer the agents' questions without requesting a lawyer.  The issue, rather, is whether Defendant waived those rights, and agreed to speak, *voluntarily*. The facts in the record as to the FBI's interactions with Defendant point strongly in only one direction, that is, that the Defendant waived his *Miranda* rights and answered questions voluntarily and knowingly.

It appears undisputed that the FBI agents acted and spoke calmly and respectively, did not threaten Defendant or induce any statements through promises, and did not engage in any overreaching or other improper tactics. Indeed, the agents released the Defendant's handcuffs, offered him water, and spoke to him for a reasonable period of time (less than two hours).  The Defendant did not demonstrate any hesitation or reluctance to speak, or any confusion about his rights.   Indeed, the Defendant clearly stated, "I know my rights.  I just want my rights."  Gov't Ex. 3 at 5.

The Defendant's argument does not focus on any conduct or deficiencies in the conduct of the interrogating FBI agents.  Rather, Defendant focuses on the alleged misconduct of the arresting RMP officers and Malaysian jail guards. Specifically, the RMP officers allegedly beat him for 20-25 minutes during his arrest, prior to his FBI interrogation, and then either RMP officers or jail guards beat him again after his interrogation (so that he would release his bank account

password), and then forced him and his Co-Defendant to slap each other.

No suppression is warranted on this basis, at least on the facts here.  First, there remains no evidence or even allegation that the American law enforcement officers contributed to or were even aware of any Malaysian misconduct.  *See United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1988) (affirming denial of suppression of statement made after alleged "torture" by Egyptian authorities, because "while it is reasonable that Egyptian incarceration and torture, if true, would likely weaken one's mental state, one's mental state does not become part of the calculus for the suppression of evidence unless there is an allegation that agents of the United States engaged in some type of coercion.  Because Abouhalima does not contend that federal agents either mentally or physically coerced his remarks during that interrogation, there is no basis for inquiry into a possible constitutional violation.").

Second, while the Court is disturbed by and takes allegations of malicious beating of a handcuffed, defenseless prisoner for as long as 25 minutes very seriously, the Court questions the reliability of the Defendant's testimony here. Both S/A Fowler and the Co-Defendant stated that the Defendant exhibited no pain or signs of injury or complaints about such just two hours later at the police station. Despite his eagerness for S/A Fowler's help in getting out of Malaysian custody, the Defendant never told S/A Fowler that he had just been beaten for 25 minutes

*that very morning* by Malaysian agents.  The Defendant testified that he was concerned that if he had done so, the Malaysian police would have found out.  But the Defendant obviously felt free to share other very pejorative information about Malaysian police and courts, including allegations that he was "beaten badly" during a previous arrest in Malaysia in 2009, that "[e]veryone from the top to the level is corrupt," and that information given to Malaysian authorities can be corruptly "leaked out," potentially revealing himself to be a "snitch" back in Nigeria.  *See* Gov't Ex. 3 at 56, 120, 125.  Indeed, Defendant at one point in the interview expressly stated that "I don't want to help Malaysian Government," not specifically because of any abuse suffered that day, but rather because of concerns of corruption and that he would be revealed as a "snitch."  *Id*. at 120.  Nothing about these exchanges suggests that the Defendant was holding back to the FBI about Malaysian misconduct.

Defendant also claims that while sharing a cell in Malaysia, he told his Co-Defendant that he was beaten during the arrest. The Co-Defendant, however, denies that Defendant ever made such a claim.  The Co-Defendant also provides a different account of his own arrest.  Although the Co-Defendant was kicked once by the arresting officers, that was specifically because he physically resisted the officers' entry into the apartment.  Tr. at 70.  The Co-Defendant otherwise stated "that's it" for any abuse by the RMP, at least at the time of arrest, and that the

RMP never threatened him.  There is no indication in the record as to why the RMP would treat the Defendant more harshly at the time of arrest and subject him to 20-25 minutes of additional beating than was applied to the Co-Defendant.  If anything, that the Co-Defendant resisted the officers would suggest that he would receive harsher physical treatment than the Defendant, as to whom there is no evidence of resistance.[3]

The Court is mindful that the Co-Defendant corroborated the Defendant's testimony about the slapping incident in the jail.  The Court certainly does not condone this strange episode.  But this occurred after the FBI interview and there is no suggestion that these six or seven slaps had any relation to Defendant's willingness to waive his *Miranda* rights and speak to the FBI earlier that day.  In the end, the Court accepts and finds plausible that the RMP's actions at arrest may not have passed muster under U.S. law to some degree.  But the Court cannot find that the factual report supports the extreme sort of conduct that would "shock the

---

[3] The Court understands that the Co-Defendant is a cooperating witness with a plea agreement, and therefore may have a bias in favor of the Government. Nevertheless, the Co-Defendant did not testify completely favorably to the Government's case, in that the Co-Defendant acknowledged a certain amount of physical abuse by the Malaysian officials, including kicking him in the head during the arrest, and forcing him to slap the Defendant at some point in the jail.  That the Co-Defendant disclosed these facts potentially unfavorable to the Government and which would appear to be otherwise difficult to verify, supports his credibility. Moreover, the Court does not rely solely on the Co-Defendant's testimony. Rather, the Defendant's claims were also contradicted by S/A Fowler's testimony and the record of the FBI interview itself, as explained above.

judicial conscience." *Cf. Salameh*, 152 F.3d at 117 (allegations of ten days of incarceration and "torture" in Egyptian custody insufficient to even justify an evidentiary hearing on motion to suppress statements later given to U.S. investigators).

Third, most basically, there is no showing of a causal connection between Defendant's interactions with the RMP during the arrest and his post-*Miranda* statement to the FBI several hours later.  *See Colorado*, 479 U.S. at 164 ("[a]bsent police conduct *causally related to the confession*, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.") (emphasis added).

Even in the case of *Miranda* or other violations, suppression is not warranted if there is a "break in the stream of events ... sufficient to insulate" later statements from the violation. *Clewis v. Texas*, 386 U.S. 707, 710 (1967). Relevant factors include "the time that passe[d]..., the change in the place of interrogations, and the change in identity of the interrogators." *Oregon v. Elstad*, 470 U.S. 298, 310 (1986).  These factors all weigh strongly against suppression here. The FBI interrogation occurred hours after the arrest, in an entirely new location (a police interview room), involving entirely new investigators (S/As Fowler and Hunt), from a different investigative agency (the FBI), representing a distinct sovereign government (the United States).  And the interview occurred only after the agents

provided, and the Defendant indicated that he understood, a complete and thorough set of *Miranda* warnings.

Defendant does not allege that the RMP officers said anything to coerce him into talking to the FBI. Defendant does not even suggest that the RMP's questioning had anything to do with this federal case, or that the RMP made any threats at all as to the Defendant's willingness to speak to the FBI. S/A Fowler began the interview by pointing out that "the door's shut. Its just – its just you and I, you and us [i.e., S/As Fowler and Hunt]. This is not gonna go to them [i.e., the Malaysian authorities], okay." Gov't Ex. 3 at 6. Nothing said in the FBI interview suggests that the Defendant disbelieved these assurances. To the contrary, as discussed above, the Defendant appeared to freely confide in the FBI and disparage the Malaysian authorities.

The record of the interrogation further refutes any conclusion that Defendant felt forced to talk to the FBI. He obviously understood the difference between the FBI and the Malaysian authorities, and expressly acknowledged that he knew he was safe with and had no obligation to talk to the FBI. And when S/A Fowler asked him, "Okay? Understanding [the *Miranda* rights that had just been read], are you willing to speak with us right now?", Defendant's response was "Of course, *If you're willing to help me*." Gov't Ex. 3 at 18 (emphasis added). That Defendant was seeking to negotiate or condition his willingness to talk on receiving some

benefit in return if anything disproves any suggestion that he was coerced.[4]

Moreover, in sharp contrast to his expressions of trust in and his willingness to talk to the FBI, the Defendant flatly stated, "I don't want to help Malaysian Government" (because he was concerned that being a "snitch" would be "leaked.") *Id*. at 120.  Plainly, this discussion reflects a defendant who knew he could say "no," and who was making a conscious and calculating choice as to which investigators he would agree to speak with and which ones he would not.   These facts all contribute to a strong showing of voluntariness, and Defendant's motion should be denied.

---

[4] The Defense does not argue that the FBI agents procured the confession with any improper promises to "help" the Defendant.  Nor does the Court perceive any such improper promise.  For example, the Defendant appeared to be fishing for some assurance that he be allowed to go home to Nigeria if he were to cooperate, *see, e.g.,* Gov't Ex. 3 at 13 ("Why can't you just take me to Nigeria? I'm from Nigeria.") but the agents did not appear to make any such assurance to induce the statements.

## III.   DISCUSSION

Defendant's Motion to Suppress [48] should be **DENIED**.  The case is otherwise **READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 15th day of February, 2018.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE